M. KENDALL DAY, Chief
Asset Forfeiture and Money Laundering Section (AFMLS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
KYLE R. FREENY
Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W., 10th Floor
  Washington, D.C. 20530
  Telephone:  (202) 514-1263
  Email:  Woo.Lee@usdoj.gov

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
CHRISTEN A. SPROULE (CBN: 310120)
Assistant United States Attorneys
Asset Forfeiture Section
  312 North Spring Street, 14th Floor
  Los Angeles, California 90012
  Telephone:  (213) 894-3391/(213) 894-4493
  Facsimile:  (213) 894-7177
  Email: John.Kucera@usdoj.gov
     __Christen.A.Sproule@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CV 16-5364 |
| Plaintiff, | |
| v. | EX PARTE APPLICATION FOR POST-COMPLAINT RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES |
| ANY RIGHTS TO PROFITS, ROYALTIES AND DISTRIBUTION PROCEEDS OWNED BY OR OWED | [Proposed Order Lodged Concurrently] |

TO JW NILE (BVI) LTD., JCL MEDIA (EMI PUBLISHING LTD), AND/OR JYNWEL CAPITAL LTD, RELATING TO EMI MUSIC PUBLISHING GROUP NORTH AMERICA HOLDINGS, INC., AND D.H. PUBLISHING L.P.,

Defendants.

[18 U.S.C. § 983(j)]

The United States, by and through the United States Department of Justice, hereby applies to this Court, pursuant to 18 U.S.C. § 983(j), for a restraining order to preserve any and all rights, presently-held and future, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to JW Nile (BVI), Ltd.; JCL Media (EMI Publishing Ltd.); and/or Jynwel Capital Ltd. (collectively, the "Subject Entities") relating to EMI Music Publishing Group North America Holdings, Inc. and D.H. Publishing L.P., generated from the date of this Order until further Order of the Court, whether paid to any of the Subject Entities or to its affiliates and/or assigns, as well as any and all monies received or held by any of the Subject Entities or its affiliates and/or assigns at the time of entry of this Order, whether as cash or held in any account in any financial institution, which constitutes any and all profits, royalties, and proceeds of distribution owned by or owed to the Subject Entities relating to EMI Music Publishing Group North America Holdings, Inc. and D.H. Publishing L.P., or related to or derived from same (all collectively referred to hereafter as the "Restrained Property").

The Restrained Property is named in a Verified Complaint for Forfeiture In Rem ("the Complaint"). The Government contends that the allegations of the Complaint establish probable cause to believe that the Business is subject to forfeiture to the United States.

The proposed restraining order provides that the United States Marshals Service ("USMS") be appointed as the Monitor of the Restrained Property and all financial accounts associated with the Restrained Property.

1    This application is based on the accompanying memorandum of points and

2    authorities, the Verified Complaint, all pleadings and papers on file in this action, and on

3    such further evidence and argument that the Court may entertain at any hearing on this

4    application.

5    Dated: July 20, 2016                    Respectfully submitted,

6                                            M. KENDALL DAY

7                                            Chief, AFMLS

8                                            EILEEN M. DECKER

9                                            United States Attorney

10

11                                           _____/s/_____

                                            JOHN J. KUCERA

12                                           CHRISTEN A. SPROULE

                                            Assistant United States Attorneys

13

14                                           WOO S. LEE

15                                           Deputy Chief, AFMLS

                                            KYLE R. FREENY

16                                           Trial Attorney, AFMLS

17                                           Attorneys for Plaintiff

18                                           UNITED STATES OF AMERICA

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

On July 20, 2016, the United States filed the Complaint, alleging that any and all rights, including copyright and intellectual property rights, as well as the right to collect and receive any profits, royalties, and proceeds of distribution owned by or owed to JW Nile (BVI), Ltd.; JCL Media (EMI Publishing Ltd.); and/or Jynwel Capital Ltd. (collectively, the "Subject Entities") relating to EMI Music Publishing Group North America Holdings, Inc. ("EMI") and D.H. Publishing L.P. (hereinafter, the "EMI RIGHTS") are forfeitable to the United States.  The Complaint alleges that the EMI RIGHTS are property that constitute, or were derived from, proceeds traceable to one or more violations of:  a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), receipt of stolen money (18 U.S.C. § 2315); (iv) wire fraud (18 U.S.C. § 1343); and (v) a conspiracy to commit such offenses.  The Complaint also alleges that the EMI RIGHTS are property that are involved in, and are traceable to property involved in, one or more money laundering transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B), and 1957, and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).

In the Complaint, the Government alleges that the procurement of a substantial interest in EMI was financed with the proceeds of a conspiracy of multiple individuals, including public officials and their associates, to misappropriate and fraudulently divert billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly-owned by the government of Malaysia, including by defrauding foreign banks, and thereafter to launder the proceeds of that criminal conduct, including in and through U.S. financial institutions.  The proceeds generated by the EMI RIGHTS represent proceeds of the misappropriation scheme alleged in the Complaint, as well as property involved in or traceable to property involved in money laundering.

The Government seeks a restraining order to preserve the presently held and future profits, royalties, and proceeds of distribution owned by or owed to the Subject Entities relating to EMI and D.H. Publishing L.P. during the pendency of this action while enabling the continued operation of EMI and D.H. Publishing L.P.

## II.   SUMMARY OF THE GOOD STAR SCHEME[1]

As one of its first investment projects, 1MDB entered into an agreement in September 2009 with PetroSaudi International ("PetroSaudi" or "PSI"), a private Saudi Arabia-based oil services company, to form a joint venture called 1MDB PetroSaudi Ltd. ("the 1MDB-PetroSaudi JV" or "Joint Venture"). The stated purpose of the Joint Venture was to exploit certain energy concession rights in Turkmenistan and Argentina that PetroSaudi purported to own. Under the terms of the agreement, (a) 1MDB agreed to invest $1 billion in cash in the Joint Venture in exchange for a forty percent (40%) equity interest in the Joint Venture, and (b) PetroSaudi agreed to give the Joint Venture the mineral extraction concessions it purportedly owned in Turkmenistan and Argentina in exchange for a sixty percent (60%) equity interest in the Joint Venture. PetroSaudi's energy concession rights were allegedly valued at approximately $2.7 billion. (Compl. ¶ 40.)

Both 1MDB's Board of Directors and Bank Negara, Malaysia's Central Bank, approved the transfer of $1 billion to the Joint Venture. However, as set forth in greater detail in the Verified Complaint (Dkt. #1), LOW Taek Jho, a/k/a Jho Low ("LOW") and his associates caused $700 million of the $1 billion that was to be invested in the Joint Venture to be sent to an account at RBS Coutts Bank in Zurich ("RBS Coutts") held in the name of Good Star Limited ("Good Star Account"). (Id. ¶ 41.)

Between May and October 2011, approximately $330 million in additional funds were wired at the direction of 1MDB officials to the Good Star Account, purportedly in

---

[1] The Verified Complaint filed on July 20, 2016, provides a more detailed description of this misappropriation and money laundering scheme.

5

connection with a financing agreement executed between 1MDB and the 1MDB-PetroSaudi JV.  (Id. ¶ 42.)

Although 1MDB officials represented, including to Deutsche Bank in Malaysia, that Good Star was a wholly-owned subsidiary of PetroSaudi, this was not true. According to banking records, Good Star was a company controlled by LOW, and LOW was also the Good Star Account's beneficial owner and sole authorized signatory.  At the time, LOW, a Malaysian national, was a 29-year-old with no official position with 1MDB or PetroSaudi.  (Id. ¶ 8, 43.)

## III.   LOW ACQUIRED AN INTEREST IN EMI MUSIC PUBLISHING USING 1MDB FUNDS DIVERTED THROUGH THE GOOD STAR ACCOUNT.

LOW laundered approximately $106,666,667 in misappropriated funds traceable to the Good Star Account to acquire a substantial interest in EMI Music Publishing Group North America Holdings Inc. ("EMI"), a music publishing company. Specifically, LOW used these funds to acquire an interest in an entity called Nile Acquisition Holding Company Ltd. ("EMI Partner A"), a Cayman Islands entity that partnered with Nile Acquisition LLC ("EMI Partner B"), a Delaware entity, to form DH Publishing L.P. (the "EMI Partnership"), EMI's parent company.

On or about October 5, 2011, the EMI Partnership, a Cayman Islands limited partnership, was formed by a consortium of entities consisting of EMI Partner A and EMI Partner B with the express purpose of acquiring EMI Group Global Limited's music publishing business.  EMI Partner A is comprised of several investors, including (i) Mubadala Development Company ("Mubadala"), a sovereign wealth entity owned by the Government of Abu Dhabi, and (ii) JCL Media (EMI Publishing) Ltd. (also known as JW Nile (BVI) Ltd.) ("LOW EMI Partner"), a subsidiary of Jynwel Capital Ltd., LOW's financial services firm based in Hong Kong.  The LOW EMI Partner was formed in the British Virgin Islands on or about November 7, 2011.  EMI Partner B is owned jointly by Sony Music Holdings, a New York corporation, and the Estate of Michael Jackson.  (Id. ¶ 364.)

6

On or about November 11, 2011, the EMI Partnership, through BW Publishing Ltd., an indirect, wholly-owned subsidiary of the EMI Partnership, entered into a sale and purchase agreement with EMI Group Global Limited, a United Kingdom company, to acquire EMI.  (Id. ¶ 365.)

Simultaneously with this acquisition, the EMI Partnership entered into an Administration Agreement with Sony/ATV Music Publishing LLC ("Sony/ATV"). Under the Administration Agreement, Sony/ATV agreed to manage EMI's day to day operations, including management and exploitation of EMI's music catalog, in exchange for an administration fee.  (Id. ¶ 366.)

EMI is the world's third largest music publishing company by revenue.  EMI owns or possesses the rights to publish approximately 2.3 million musical compositions, both historic and recent, from a variety of genres and a variety of musicians, including a number of Grammy-winning artists.  (Id. ¶ 367.)

In connection with its vast music catalog, EMI generates revenue from several sources including, among others, (i) royalties and fees earned when its songs are performed publicly; (ii) royalties from paid-streaming services; (iii) royalties and fees earned in exchange for the right to use songs for physical recordings or digital downloads; (iv) royalties and fees paid for use of music in timed synchronization with visual images; and (v) royalties and fees paid for use of a song in stage productions, and rental of orchestra scores.  (Id. ¶ 368.)

### A.    LOW's Acquisition of an Interest in EMI PARTNER A

EMI Partner A was formed on or about September 29, 2011, in the Cayman Islands.  Initially, EMI Partner A's sole shareholder was Fifty Sixth Investment Company Ltd., an entity based in Abu Dhabi.  In June 2012, Fifty Sixth Investment Company Ltd. transferred its sole share in EMI Partner A to Mubadala.  (Id. ¶ 369.)

On or about June 29, 2012, several entities agreed to subscribe for ordinary shares in EMI Partner A pursuant to an Investment Agreement Relating to Nile Acquisition

Holding Company Limited (the "EMI Investment Agreement"). These entities included: (i) Nile Cayman Holding Ltd. ("the "Mubadala Subsidiary"), an entity owned by Mubadala; (ii) Pub West LLC, a Delaware company; (iii) GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l.; (iv) Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l.; (v) GSO SJ Partners LP; and (vi) the LOW EMI Partner. (Id. ¶ 370.)

        An internal EMI document described the LOW EMI Partner as follows:

> [LOW EMI Partner] is a private equity investment holding company advised by Jynwel Capital Limited, an investment and advisory firm whose chief executive officer is [LOW]. [LOW] is a member of [EMI's] advisory board and served as [EMI's] Non-executive Chairman-Asia. Jynwel Capital Limited has advised [EMI] that [LOW EMI Partner] is owned by trusts for the benefit of the Low family.

(Id. ¶ 371.)

        Pursuant to the EMI Investment Agreement several investors agreed to subscribe for shares in EMI Partner A. Specifically:

        a.    The Mubadala Subsidiary agreed to acquire approximately 66.2 percent of EMI Partner A's capital, consisting of 6,620.068965 ordinary shares, for $320,000,000.

        b.    The LOW EMI Partner agreed to acquire approximately 22.06 percent of EMI Partner A's capital, consisting of 2,206.89656 ordinary shares, for $106,666,667. Li Lin Seet executed the EMI Investment Agreement on behalf of the LOW EMI Partner in his capacity as its "director."

        c.    GSO Capital Opportunities Fund II (Luxembourg) S.a.r.l. agreed to acquire approximately 5.69 percent of EMI Partner A's capital, consisting of 569.36719 ordinary shares, for $27,519,414.

d.      Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 3.22 percent of EMI Partner A's capital, consisting of 322.68240 ordinary shares, for $15,596,316.[2]

e.      Pub West LLC agreed to acquire approximately 1.37 percent of EMI Partner A's capital, consisting of 137.93104 ordinary shares, for $6,666,667.

f.      Blackstone/GSO Capital Solutions Offshore Funding (Luxembourg) S.a.r.l. agreed to acquire approximately 1.2 percent of EMI Partner A's capital, consisting of 120.15875 ordinary shares, for $5,807,673.

g.      GSO SJ Partners LP agreed to acquire approximately 0.22 percent of EMI Partner A's capital, consisting of 22.27442 ordinary shares, for $1,076,597.  (Id. ¶ 372.)

Furthermore, under the EMI Investment Agreement, the LOW EMI Partner was authorized to play a role in the management and operations of EMI through its ownership stake in EMI Partner A.  Specifically, for instance, the EMI Investment Agreement provides that the LOW EMI Partner may participate in selecting two of EMI Partner A's nine directors.  (Id. ¶ 373.)

Additionally, under the EMI Investment Agreement, the single largest individual shareholder within the LOW EMI Partner  (the "LOW EMI Principal Shareholder") is permitted to play a role in selecting key EMI officials, including EMI Partner A's chief executive officer, EMI Partner A's general counsel, EMI Partner A's chief financial officer as well as the EMI Partnership's officers.  According to internal records from Bank of New York Mellon, where the LOW EMI Partner opened a bank account, the LOW EMI Partner is a wholly-owned subsidiary of Jynwel Capital Ltd., whose sole shareholder is LOW.  (Id. ¶ 374.)

Additionally, the LOW EMI Principal Shareholder is permitted in his sole discretion to select the EMI Partnership's Non-Executive Chairman – Asia.  This official

---

[2] Blackstone/GSO Capital Solutions Onshore Funding (Luxembourg) S.a.r.l. is an affiliate of the private investment firm Blackstone Group, an entity based in New York.

1    is responsible for "observational oversight of the business operations of the Partnership

2    in Asia excluding Japan."  EMI's Non-Executive Chairman – Asia is also invited to

3    attend "ceremonial events relating to [EMI] and any other related music industry public

4    events that may be relevant to [EMI], in each case, to which all members of the board of

5    [the EMI Partnership] are invited."  (Id. ¶ 375.)

6         According to a document entitled "LOW FAMILY HISTORY AND

7    BACKGROUND, ORIGINS OF JYNWEL CAPITAL," which was distributed to

8    various companies by LOW as recently as February 2015, LOW serves as the "Non-

9    executive Chairman, Asia, for EMI Music Publishing, [and is] also serving as a member

10   of [EMI's] advisory board."  According to this same document, LOW led recent

11   transactions and advised the Low family investment trusts including one relating to a

12   "USD2.2 billion acquisition of EMI Music Publishing Group by Sony, Mubadala,

13   Blackstone Group's GSO Capital Partners and David Geffen."  (Id. ¶ 376.)

14        The proceeds of the share purchases described above were used by EMI Partner A

15   to, among other things, make capital contributions to the EMI Partnership.  Each

16   partner's respective partnership interest in the EMI Partnership is calculated based upon

17   their percentage of ownership of the partnership's Class A Units.  According to the

18   Fourth Amended and Restated Exempted Limited Partnership Agreement of D.H.

19   Publishing L.P., dated March 7, 2014, EMI Partner A made a capital contribution of

20   $483,333,396 to the EMI Partnership in exchange for 60.166 percent of the EMI

21   Partnership's Class A Units.  Likewise, EMI Partner B made a capital contribution of

22   $320,000,038 to the partnership in exchange for 39.834 percent of the EMI Partnership's

23   Class A Units.  (Id. ¶ 377.)

     **B.    *Transfer of Proceeds Through the United States***

26        On or about June 8, 2012, approximately $120,000,000 in funds were wired from

27   the Good Star Account to an account at BSI Bank in Singapore held in the name of Abu

28

Dhabi Kuwait Malaysia Investment Corp. ("ADKMIC BSI Account") via a correspondent bank account in the United States at J.P. Morgan.  (Id. ¶ 378.)

On or about June 11, 2012, a wire of approximately $120,000,000 was sent from the ADKMIC BSI Account to an account at BSI Bank held in the name of Low Hock Peng, a/k/a Larry Low, who is LOW's father, (the "LHP Account").  That same day, (i) a wire for $118,000,000 was transmitted from the LHP Account to LOW's personal account at BSI Bank; (ii) a wire for $115 million was sent from LOW's personal account at BSI Bank to an account in the name of Jynwel Capital at BSI Bank ("Jynwel Account A"); (iii) a wire for $115 million was sent from Jynwel Account A to another account also maintained in the name of Jynwel Capital ("Jynwel Accont B") at BSI Bank; and (iv) a wire for $110 million was sent from Jynwel Account B to an account in the name of the LOW EMI Partner at BSI Bank ("LOW EMI Account").  (Id. ¶ 379.).

On or about June 13, 2012, an escrow account was opened by the LOW EMI Partner with Bank of New York Mellon (the "EMI Escrow Account") in the United States.  The account opening documents were signed by Li Lin Seet, who identified himself as LOW EMI Partner's director.  The opening records also confirm that LOW is the "100[%] (ultimate)" owner of the LOW EMI Partner and that Jynwel Capital Ltd. is the "100% direct" owner.  (Id. ¶ 380.)

On June 26, 2012, a wire for $320,000,000 was sent from Mubadala Treasury Holding Co. LLC's account at First Gulf Bank in Abu Dhabi to the EMI Escrow Account.  A notation on the wire instructions indicated that the funds were intended to be sent to "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT."  As noted above, "NILE ACQUISTION HOLDING LTD" is the legal name of EMI Partner A.  Furthermore, as noted above, pursuant to the EMI Investment Agreement, Mubadala agreed to acquire its interest in EMI Partner A for $320,000,000.  (Id. ¶ 381.)

That same day, a wire for $106,666,667 was sent from the LOW EMI Account to the EMI Escrow Account.  A notation on this wire read "NILE ACQUISITION HOLDING LTD ESCROW ACCOUNT."  As noted above, pursuant to the EMI

Investment Agreement, the LOW EMI Partner agreed to acquire its interest in EMI Partner A for $106,666,667.  (Id. ¶ 382.)

The funds transferred by LOW into the EMI Escrow Account were used to acquire the LOW EMI Partner's interest in EMI Partner A and were transmitted in a manner intended to conceal the origin, source, and ownership of criminal proceeds, based on the following facts and circumstances, among others:

a. Funds were moved through multiple accounts owned by different entities on or about the same day in an unnecessarily complex manner with no apparent business purpose.

b. For instance, there is no apparent commercial reason that LOW would layer his transaction by funneling the exact same amount of money through six different bank accounts at the same financial institution on or about the same day.

c. Individuals engaged in money laundering and other unlawful conduct often pass money through intermediary accounts to conceal the true source of the funds.

d. In materials that LOW submitted to entities with whom he sought to do business, LOW represented that family resources were a significant source of his wealth.  By funneling money through his father's account for a brief period of time, LOW created the appearance that funds in his personal account, which were used to acquire an interest in EMI Partner A, came from his father rather than from Good Star or ADKMIC.  (Id. ¶ 383.)

e. At the time LOW transferred misappropriated funds from his LOW EMI Partner account in Singapore to the EMI Escrow Account, he knew those funds constituted misappropriated funds and intended to deprive 1MDB of ownership of those funds.  (Id. ¶ 384.)

## IV.   THIS COURT SHOULD ORDER THE RESTRAINT OF THE RESTRAINED PROPERTY.

Title 18 U.S.C. § 983(j)(1)(A) authorizes the United States to seek, and the Court to issue, an ex parte restraining order over all assets that are designated in a civil forfeiture complaint as forfeitable to the United States.  The statute provides:

12

(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of satisfactory performance bonds, create receiverships, appoint conservators, custodians, appraisers, accountants, or trustees, or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture—

> (A) upon the filing of a civil forfeiture complaint alleging that the property with respect to which the order is sought is subject to civil forfeiture...

18 U.S.C. § 983(j)(1)(A).

The text of Section 983(j)(1)(A) provides that a restraining order may be entered <u>ex parte</u> upon the filing of a complaint, and includes no requirement of pre-restraint notice or a hearing when a civil forfeiture complaint has already been filed.  Section 983 (j)(1)(A) diverges from the statutory provision governing an application for a restraining order made prior to the filing of a complaint, 18 U.S.C. § 983(j)(1)(B), which provides for "notice to persons appearing to have an interest in the property and opportunity for a hearing" before a restraining order can issue.  Section (j)(1)(A), which governs applications made post-complaint, contains no such language.  <u>See</u> <u>United States v. Melrose E. Subdivision</u>, 357 F. 3d 493, 499 (5th Cir. 2004) (noting relevance of absence of any mention of a pre-restraint hearing before issuance of post-complaint restraining order under 18 U.S.C. § 983(j)(1)(A)).  In this way, Sections (j)(1)(A) and (j)(1)(B) mirror the provisions governing restraining orders in criminal cases, which require notice and a hearing when the Government seeks a restraining order before, but not after, obtaining an indictment.  <u>See</u> 21 U.S.C. §§ 853(e)(1)(A) (post-indictment) and 853(e)(1)(B) (pre-indictment).

Here, a restraining order should properly issue because a Complaint has been filed alleging that the EMI RIGHTS are subject to forfeiture to the United States.[3]  As alleged

---

[3] The text of 18 U.S.C. § 983(j)(1)(A) does not require any further showing before a restraining order may issue.  In the context of an application for an order restraining property made pursuant to 21 U.S.C. § 853(e) in a criminal case, the Supreme Court has

*(footnote cont'd on next page)*

1   in the Complaint, the EMI RIGHTS are subject to forfeiture pursuant to 18 U.S.C. §

2   981(a)(1)(A) as property involved in one or more money-laundering transactions in

3   violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B), 1956(h) and 1957, or because

4   they are traceable to such property.  The EMI RIGHTS are further subject to forfeiture

5   under 18 U.S.C. § 981(a)(1)(C) because they constitute or are derived from the proceeds

6   of a "specified unlawful activity," or a conspiracy to commit a specified unlawful

7   activity.

8          "Specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(A) and

9   (c)(7)(B)(iv), includes foreign offenses involving the misappropriation of public funds

10  by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); fraud by or

11  against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); international transportation or

12  receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), receipt of stolen

13  money (18 U.S.C. § 2315); wire fraud (18 U.S.C. § 1343); and conspiracy to commit

14  such offenses.

15         By this application, the United States requests that the Court order that EMI Music

16  Publishing Group North America Holdings, Inc., D.H. Publishing L.P., EMI PARTNER

17  A and Sony/ATV Music Publishing LLC be restrained from dissipating the Restrained

18  Property, and that the United States Marshals Service be granted oversight over the

19  Restrained Property and all financial accounts associated with it.  Such a restraint is

20  consistent with federal forfeiture law and the Court's equitable powers.[4]

21

22

23  – – – – – – – – – – – – – –

24  held that a probable cause standard applies.  United States v. Monsanto, 491 U.S. 600,
    615-616 (1989).  Here, the facts alleged in the Complaint (and summarized above) are
25  more than sufficient to establish probable cause to believe that the EMI RIGHTS are
    forfeitable to the United States.
26       [4] For example, the procedural rules governing in rem forfeiture proceedings
27  recognize a court's power to restrict the use (as well as the sale or disposition) of
    property subject to forfeiture.  See Supplemental Rules for Admiralty or Maritime
28  Claims and Asset Forfeiture Actions, Rule G(7)(a).

**V.      THE UNITED STATES IS ENTITLED TO <u>EX PARTE</u> ISSUANCE OF A RESTRAINING ORDER WITHOUT PRIOR NOTICE AND OPPORTUNITY FOR HEARING.**

In the present action, the Government seeks to preserve the availability of the EMI RIGHTS that the Complaint alleges are subject to forfeiture.  The requested restraining order is the only means of ensuring that the assets will be available for forfeiture as sought by the Complaint.  For these reasons, the immediate restraint of the assets upon the ex parte application of the United States is in the public interest.

Failure to restrain, preserve, and properly account for the Restrained Property will likely result in its irrevocable loss and will render it unavailable for forfeiture.  Without a restraining order, JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., LOW, or other related persons or entities could dissipate the Restrained Property, leaving those assets unavailable for forfeiture.  The Government seeks a restraining order that will permit EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC or the current manager or owner of the EMI RIGHTS to continue to operate, function and maintain business as usual, rather than a more intrusive remedy, such as a seizure.

**VI.   EXTENT OF RESTRAINING ORDER**

For the foregoing reasons, the Government requests that this Court enter a restraining order, on an ex parte basis, immediately restraining the Restrained Property. The proposed restraining order provides as follows:

a.      The USMS is hereby appointed the Monitor of the Restrained Property, and all accounts associated with same.  The USMS may name a designee and/or monitor to conduct and perform the services identified herein and for the purpose of reporting to the Court during the term of this Order.

b.      JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., LOW, their attorneys, agents, and other family members, and anyone acting on their behalf, and all persons or entities acting in concert or participation with any of the above, and all persons and entities having actual knowledge of the order shall not

directly or indirectly, transfer, sell, assign, pledge, distribute, hypothecate, encumber, attach or dispose of in any manner; cause to be transferred, sold, assigned, pledged, distributed, hypothecated, encumbered, attached or disposed of in any manner; or take, or cause to be taken, any action that would have the effect of depreciating, damaging, or in any way diminishing the value of the Restrained Property, including any action that would increase costs or reduce revenues.

c.     The owners of the Restrained Property, including JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW, are required to maintain the present contracts and agreements related to the EMI RIGHTS, and ensure timely payment on the same, and adhere to all provisions of any applicable contract or agreement, until further order of this Court; and shall allow the United States to join in and direct key business decisions about day to day operations and to monitor compliance with the Order by all lawful means available.

d.     JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW shall not make any effort to interfere with the collection or preservation of the Restrained Property.

e.     Except as otherwise provided in the Order, all persons, financial institutions, and other entities who have or assert any access to, interest in, control over, or legal claim to the Restrained Property, and all such persons' or entities' agents, servants, employees, attorneys, family members, and those persons in active concert or participation with them, including but not limited to JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW shall be restrained, prohibited, and enjoined from attempting or taking any action that could affect the availability, marketability, or value of the Restrained Property, including but not limited to, selling, conveying, transferring, bailing, assigning, pledging, collateralizing, hypothecating, encumbering, wasting, secreting, damaging, diminishing the value of, disposing of, or removing from the jurisdiction of this Court, all or any part of their interest, direct or indirect, in the Restrained Property.

16

<u>With respect to financial institutions:</u>

f.      Any and all financial institution holding any of the Restrained Property or which relate to the collection of the Restrained Property, shall be enjoined, ordered, and directed to:

i.      upon written request by the USMS, alter the signature cards to issue signature authority in the names of persons designated by the USMS, and provide the USMS with access to online banking;

ii.      take all reasonable and necessary steps to ensure that all financial activity and information flow regarding the Restrained Property be conducted only by the USMS or the USMS monitor designated by the USMS.  No financial activity or any sort may be conducted by or at the direction of any party other than the USMS or the monitor designated by the USMS;

iii.      take no offset against any account, but continue to allow debits and withdrawals from the account unless otherwise directed in writing by the USMS;

iv.      continue to credit any deposits, interest, dividends, capital gains distributions, or other credits to any such account in the normal course of business, provided that any such deposits, interest, dividends, capital gains distributions, or other credits are subject to this Order;

v.      upon receiving notice of the Order, promptly inform the USMS as to the account balances at the time of notice, and thereafter promptly respond to requests from the USMS for updated information about the accounts' status, balances, and activity; and

vi.      not receive directions, conduct transactions, or provide any financial information related to the management of the Restrained Property or the collection of the Restrained Property, to JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW, their employees, agents, and family members, or any and all persons otherwise associated with or employed by JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW.

<u>With respect to the business operations:</u>

g.      EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A or the current manager or owner of the EMI RIGHTS and/or any designee of the USMS shall:

i.      Immediately identify all relevant accounts – EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS shall immediately identify to the USMS any and all accounts being utilized with respect to the management of the Restrained Property or for the collection or disbursement of the Restrained Property, and which individuals and entities have access to or control over those accounts.  Red Granite shall not open new accounts or change or close existing accounts related to or holding the Restrained Property or for the collection or disbursement of the Restrained Property without the express approval or at the direction of the USMS.

ii.      Maintain customer service, privacy, and security -- EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS shall maintain its existing service, privacy, and security protections to all customers and the general public in compliance with all existing contracts, policies, and practices, and shall not reduce the quality or frequency of same to any customer or the general public, unless and until further ordered by the Court, or unless or until approved by the USMS, their designee, or an appointed monitor.

iii.      Operate lawfully and prudently -- EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS shall operate in compliance with all applicable federal, state, and local laws and regulations, carry out all managerial, collection, and other obligations pursuant to agreement or contract, and maintain customary practices applicable within the level of the industry.

iv.     Follow Generally Accepted Accounting Principles ("GAAP") in accounting, and preserve records – EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS shall conduct and record its transactions, bookkeeping, and accounting in accordance with GAAP, and shall not discard or destroy any business records during the pendency of the Order, unless or until further ordered by the Court, or unless or until approved by the USMS, its designee, or an appointed monitor.

v.     Discretion to review and require pre-approval of every transaction -- the USMS, its designees, and/or an appointed monitor shall have authority to require that the conducting of any transaction, and the incurring of any obligations, occur only with the written approval of the USMS/monitor, which approval shall be given if the transaction is found to be necessary in the ordinary course of business.  The USMS/monitor shall have the authority to pre-approve, in writing, designated categories of transactions to occur or obligations to incur, where the USMS/monitor determines that such categorical pre-approval is necessary for the effective operation of the business; but the USMS/monitor shall also have authority to examine all records and information concerning such transactions/obligations, and to revoke or revise such categorical authorization at any time.  In no event shall USMS be obligated, liable or required to pay funds from any other source than the accounts or assets of Red Granite.

vi.     No other transactions and retention of the Restrained Property – EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC or the current manager or owner of the EMI RIGHTS is prohibited from conducting any transaction or incurring any obligation with respect to the Restrained Property except if done in compliance with subsection (d) above.  Unless directed by the USMS, EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS shall continue to collect the Restrained Property

in the existing accounts utilized for that purpose, and subject to transactions approved in accordance with subsection (d) above, shall retain the Restrained Property in those accounts until otherwise instructed by the Court or the USMS.  In its discretion, the USMS may direct that the monthly net proceeds of the Restrained Property, after approval and necessary expenditures have been accounted for, be paid into an escrow or an official U.S. government account pending resolution of this case.

vii.     "Conducting a transaction" or "incurring an obligation" defined – "Conducting a transaction" and "incurring an obligation" includes, but is not limited to, withdrawing, depositing, or transferring any of the Restrained Property, whether in cash or by check, ATM, electronic, ACH, ETF, or wire transfer; writing any check or causing any kind of check to be issued; purchasing or leasing any good, vehicle, equipment, inventory service, or any other business in whole or in part paying any wage, bonus, benefit, or other form of payment, remuneration, or distribution to any owner or employee of JW Nile (BVI), Ltd., JCL Media (EMI Publishing Ltd.), Jynwel Capital Ltd., and/or LOW or any other person or entity without express permission of the USMS.

<u>United States Marshals Service's entry and access to conduct business review and appraisal:</u>

h.     The USMS and/or its designees are forthwith authorized to make entry into any part of the business premises of EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS during business hours to conduct both a thorough review of the business operations related to the Restrained Property and to complete an inspection, inventory, and appraisal of the condition and value of the Restrained Property.  The USMS may be accompanied by one or more appraisers and/or federal agents and/or government and contract personnel selected by the USMS to assist them.  In conducting the review and appraisal, the USMS shall have the following authority:

20

i.      Observe business operations -- to enter all premises and offices during business hours, to observe all aspects of the operations of EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS related to the Restrained Property, including but not limited to:  the daily accounting, recording, depositing, and processing of cash and other receipts; payments of salaries, bills, and other business obligations; communications with and solicitations of customers and potential customers; hiring, firing, and supervision of employees; use, maintenance, and handling of equipment; business activity occurring away from the office and business premises, including any indirect service provider.

ii.      Review and copy documents and data -- to review, inspect, and copy all documents and data relating to the Restrained Property, including but not limited to: all books and records and data, whether in hard copy format, microfiche, or magnetic, floppy-disc, ZIP drive, hard drive, local or remote server, or any other computer-storage medium whether or not such data storage is password protected; the contents of all correspondence on file; the contents of all incoming mail at all mail-receipt locations; all employee records including personnel files, and payroll, benefit, pension, and retirement account records; all customer data, including lists, contracts, and locations, billing, accounts, and accounts receivable; all bank and financial records; all security, alarm, and surveillance systems; and all records of loans, debts, mortgages, liens, or other security interests, whether issued by or held upon EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the current manager or owner of the EMI RIGHTS, or held upon any equipment, inventory, vehicle, account, account receivable or other thing of value.

iii.      Interview owners, managers, employees, contractors, vendors and consultants -- to interview owners, managers, employees, contractors, vendors and independent contractors of EMI Music Publishing Group North America Holdings, Inc., D.H. Publishing L.P., Sony/ATV Music Publishing LLC, EMI PARTNER A, or the

1  current manager or owner of the EMI RIGHTS with respect to business operations.  This

2  authority shall supersede any state law privilege that may exist between the subject

3  parties.

4              iv.     Memorandum of Understanding -- after assessment by the

5  USMS, a manager may be appointed for the Restrained Property.  The manager shall

6  enter into a Memorandum of Understanding ("MOU") with the USMS that details

7  specific duties and obligations.  Nothing in this Restraining Order or the MOU shall

8  provide any legal, right, title or interest in the property.  The USMS has the right to

9  remove and replace this manager for any reason, including, but not limited to, a violation

10  of the MOU or this Restraining Order.

11  ///

12  ///

# VII. CONCLUSION

Wherefore, the United States respectfully requests that the Court grant this ex parte application and Order for the restraint of the Restrained Property as requested in the proposed order submitted concurrently herewith.

DATED: July 20, 2016                    Respectfully submitted,

                                         M. KENDALL DAY
                                         Chief, AFMLS

                                         EILEEN M. DECKER
                                         United States Attorney


                                         _____/s/_____
                                         JOHN J. KUCERA
                                         CHRISTEN A. SPROULE
                                         Assistant United States Attorneys

                                         WOO S. LEE
                                         Deputy Chief, AFMLS
                                         KYLE R. FREENY
                                         Trial Attorney, AFMLS

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA